SPRING CREEK VILLAGE
APARTMENTS PHASE
V, INC., Appellant

v.

GENERAL STAR INDEMNITY
COMPANY, Appellee.

No. 14–06–00978–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

June 24, 2008.

Dax O. Faubus, Robert Lee Galloway, Houston, for appellant.

William M. Briscoe, Warren W. Harris, Houston, for appellee.

Panel consists of Justices YATES, GUZMAN, and PRICE.*

## OPINION

EVA M. GUZMAN, Justice.

This dispute concerning payments allegedly due under an excess insurance policy is before a court of appeals for the third time. In the instant suit, after a jury found covered damages in an amount less than the limits of the primary coverage, the trial court rendered a take-nothing judgment in favor of the excess insurer. On appeal, the insured argues that the amount of covered damages found by the jury is so small as to be against the overwhelming weight of the evidence. Because the jury's finding is within the range of the evidence presented relevant to the issue of covered damages and is not against the great weight of the evidence, we affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At the time of the events discussed below, Spring Creek Village Apartments Phase V, Inc. ("Spring Creek") had primary insurance coverage with Reliance Insurance Company of Illinois ("Reliance") for property damage and loss of business income up to $1 million. In the event of covered property damage, the terms of the policy required Spring Creek to send repair estimates to the insurer and receive actual cash value for the damaged property in return. After repairs were complete, Spring Creek could submit a waiver and lien release from the contractor, and in return, would receive the difference between actual cash value and replacement cost. Spring Creek also had excess coverage exceeding the $1 million primary policy limit through General Star Indemnity Company ("General Star"). By its terms, the General Star policy only applied after the coverage provided by Reliance was exhausted. Otherwise, the General Star policy followed the terms, conditions, and definitions of coverage and recovery stated in the Reliance policy.

### A. Immediate Response to the Tornado

On February 10, 1998, a category F–1 [1] tornado caused damage to the Spring

---

* Sr. Justice Frank C. Price sitting by assignment.

1. According to the testimony of meteorologist Ron Stagno, an F–1 tornado produces winds

Creek Village Apartments.[2] The next day, owner Archie Tracy contracted with public adjusters Jansen & Co. to adjust the loss. A day later, Reliance's adjustor, Don McLain, together with Greg Herring of Jansen & Co. and Deborah Frazier of Cavalry Construction,[3] began to evaluate the scope of the damage from the tornado. At that time, blue tarpaulins had been fastened or nailed to the damaged roofs of the buildings. Tracy wrote to McLain and stated that damage would increase with rain. McLain responded, "It appears that you have taken steps [to] protect the exposed structure by fastening sheet plastic over the affected areas. To this end, you are taking the necessary steps to mitigate the potential for future damage in the event the apartments are exposed to additional rainfall. However, we agree that temporary covers will not withstand any moderate to severe storm activity."

Approximately one week later, on February 18, 1998, General Star personnel wrote to Tracy and purported to summarize an earlier conversation, stating, "As per our telephone conversations it has been determined that the damage from this incident will not approach $1,000,000.00." The next day, Southwest Services, Inc. ("Southwest"), a company owned by Chris Purcell and George Farmer, approached Tracy with a repair proposal. Southwest offered to apply white epoxy to the roofs at a cost of $349,455.00.[4] Tracy then completed a sworn statement in proof of loss on February 26, 1998 in exchange for a $50,000 advance payment. During the remainder of the month, AC Roofing & Construction ("AC Roofing")

replaced the blue tarpaulins on the damaged roofs with temporary repairs to prevent further damage.

## B. The Calvary and Jansen Estimates

On March 11, 1998, Deborah Frazier estimated that interior repairs would cost $226,988.54. The following day, Calvary estimated that roof repairs would cost $149,740.55. According to Spring Creek, Greg Herring also completed his estimate (the "Jansen estimate") on or about March 12, 1998. The property damages listed in the Jansen estimate totaled $444,492.30.

## C. Global Steel Builders

Tracy was unhappy with these estimates, and on March 18, 1998, he contracted with Global Steel Builders "for the service of managing, adjusting and reconstructing certain portions of this apartment complex at the discretion of Archie Tracy." The contract provided:

> Spring Creek Village Apartments, Phase V, Inc. agrees to pay Global Steel Builders ten percent of the twenty percent overhead and profits final amount. Global Steel Builders will also receive a twenty percent bonus for raising the claim above it's [sic] original amount. When the final (partial agreement settlement) is signed by Archie Tracy from Jansen & Company, Global Steel Builders also agrees to reimburse Spring Creek Village Apartments, Phase V, Inc., five percent of the bonus monies owed to Jansen & Company from their profits.

of 73–112 mph.

2. On the same day, the fire department responded to smoke from an item left near a stove when the power was off. When power was restored, the object caught fire, sending smoke into several apartments.

3. Calvary Construction was hired by McLain to estimate the interior damage to the apartments and process McLain's exterior and roof estimates.

4. The estimate was signed by George Farmer.

Global Steel listed the same address and fax number as Southwest Services, and the contract was signed on Global Steel's behalf by Christopher R. Purcell, the co-owner of Southwest Services.

The following day, Tracy executed a "Consignment of Interest" appointing Global Steel as Spring Creek's agent. He also wrote McLain that he would "bring in additional construction experts to evaluate the damage so that a fair settlement can be made."

In the meantime, Tracy continued to receive other repair offers. On March 21, 1998, AC Roofing offered to complete roof repairs for $140,973.85, with payment due ten days after completion of work. AC Roofing also offered to replace all mansard roof systems with fiberglass self-seal asphalt shingles at a cost of $63,000.00. According to Alton Christian, AC Roofing's owner, the work could have been completed within three weeks.

Two days after AC Roofing made this offer, Global Steel estimated it would cost $3,054,248.80 to repair the exteriors of the apartments. Global Steel then covered the roofs of the apartment complex with sheets of clear visquine. The visquine was attached with "nailers," consisting of 1″ × 4″ boards with nails driven through the board and into the roof.[5]

## D. Leaking Roofs and Reinspections

On April 8, 1998, Tracy wrote to McLain as follows:

> Until we fix the roofs—which are all leaking from the windstorm I can't fix the sheetrock and carpet etc ... I have been telling you for weeks ... most of my roofs are leaking from the windstorm. I would love to work with you, but you have not been interested in

funding the project and we continue to leak. I could place more traps [sic] over all the leaks until we can agree on a scope of damages—What do you think?

McLain immediately responded, "If your roofs have been leaking since the temporary repairs were installed, you certainly haven't disclosed this fact to us. If you advised Jansen & Co. of this problem, they haven't disclosed this to us either." McLain advised Tracy of the need to schedule a visit and asked that "all other individuals acting on your behalf" attend. He also asked for estimates from restoration contractors. One week later, Tracy wrote to McLain that, effective April 16, 1998, Chris Purcell, rather than Jansen & Co., would be representing Spring Creek.

McLain reinspected the roofs on April 22, 1998, but Tracy did not attend. At that time, McLain saw that the blue tarpaulins had been replaced with visquine nailed through roofs, and that visquine also covered buildings that had not previously been covered with tarpaulins. According to McLain, this caused additional water damage by puncturing roof membranes and allowing water to pool. Later that day, McLain wrote to Tracy, stating that McLain had brought checks for $286,302.32 for the actual cash value of the damages[6] to the meeting but Tracy had not attended, and Tracy's son Scott could not sign the Proof of Loss. McLain stated that negligently-installed plastic punctured the roof membrane, trapped water, and caused wet sheetrock. Tracy then wrote to General Star and stated that the loss would exceed $1 million.

In response to inquiries from McLain, Alton Christian, owner of AC Roofing, wrote that his company worked from February 20 through the end of that month

---

**5.** Global Steel sent Tracy an invoice for $45,403.87 for this work.

**6.** This included payment for fire-damaged apartments as well.

performing temporary patching authorized by Greg Herring. He further stated that he had been back on several occasions for patching, and "To date everything is fine to the best of my knowledge. I have received no calls."

## E. City Wide Construction

On May 11, 1998, an "Appraisal Agreement" was executed between Global Steel, Spring Creek, and City Wide Construction, owned by Steve Edwards. Under the terms of this agreement, Spring Creek agreed to "compensate City Wide for its time and costs incurred in this process, for an amount not to exceed [five] (5%) percent of the gross settlement amount." This agreement also provided City Wide with a larger percentage share of any gross settlement amount if Spring Creek's loss exceeded $2,000,000. Three days after this agreement was executed, Tracy sent a certified letter to Reliance in which he invoked the appraisal procedure described in the Reliance insurance policy.

## F. The Appraisal Process

Under the terms of the Reliance policy, if the parties disagreed as to the amount of a loss, either party could demand an appraisal. Both parties were required to "select a competent and impartial appraiser," and the two appraisers would select an umpire. An agreement between any two of these three individuals regarding the amount of the loss would be binding. Because General Star owed no obligation to Spring Creek until the loss exceeded $1 million, General Star did not participate in the appraisal process.

Spring Creek named Edwards as its appraiser. Reliance hired John Lochridge, Jr., of Unified Building Sciences,

Inc., and Leonard Taylor was selected as the umpire. Both Edwards and Taylor engaged Greg Presswood to evaluate the amount of damage to the interior of the apartments. Edwards then estimated the amount of loss to Spring Creek at $5,286,000, but Lochridge estimated the amount of loss at $293,120.01. Taylor found replacement cost value of the loss to be $2,105,790.98, with an actual cash value of $1,566,673.51. Both Taylor and Edwards signed the award.

## G. Suit is Filed

Reliance filed a declaratory judgment action seeking to have the appraisal award declared invalid on the grounds that (1) it contained items not covered under the policy, and (2) the umpire exceeded his authority in making causation and coverage determinations. A Reliance officer[7] cited Lochridge's expressions of concern regarding "the fact that the insured's appraiser and the umpire were unwilling to segregate those damages which were caused by the windstorm from those damages which were not caused by the windstorm." Spring Creek filed a counterclaim seeking enforcement of the award. On September 14, 1999, Spring Creek's counsel wrote to Anthony R. Colucci, a claims examiner for General Star Management Company, and asked General Star to "pay the $1,105,790.98 due in excess of the $1,000,000 primary coverage." General Star did not pay, and Spring Creek filed a third-party action against General Star.

## H. Summary Judgments

In November 2000, the trial court granted partial summary judgment in favor of Spring Creek and held that the appraisal

---

**7.** Sheldon McCaman, Assistant Vice President, Boiler & Machinery Property Claims for Reliance National.

award was binding.[8] The trial court's ruling left undecided the question of whether Spring Creek had failed to mitigate its damages.[9] In December 2000, the trial court granted summary judgment in favor of General Star, holding that Spring Creek had no cause of action against General Star for breach of the duty of good faith and fair dealing.[10]

## I. First Jury Trial

In 2001, the first trial of the contractual claims resulted in a jury verdict in favor of Spring Creek, and damages were assessed based on the appraisal award.[11] Reliance was severed from the case, and General Star appealed the interlocutory judgment on Spring Creek's contractual claims. The appeal was dismissed and the case remanded.[12]

## J. Second Jury Trial

The second trial addressed Spring Creek's extracontractual claims, and ended in a judgment that General Star violated provisions of the Texas Insurance Code and the Deceptive Trade Practices Act ("DTPA"). The trial court entered final judgment awarding Spring Creek damages pursuant to the appraisal award, penalties under the Insurance Code and the DTPA, and attorneys' fees.[13] General Star appealed. This court affirmed the trial court's judgment that General Star did not owe Spring Creek a duty of good faith and fair dealing, but reversed summary judgment in favor of Spring Creek on its attempt to enforce Taylor's award.[14] We explained that because Edwards had a financial interest in returning an estimate above $2 million, there was a fact issue concerning his impartiality.[15] Moreover, Taylor submitted an affidavit in which he stated that he relied in part on the appraisers' determinations of loss.[16] The case was therefore remanded a second time.

## K. Third Jury Trial

On remand, the trial court granted Spring Creek partial summary judgment on the ground that there was no evidence it failed to mitigate its damages. Spring Creek subsequently abandoned its claim that General Star was bound by Taylor's appraisal award.

The jury found that General Star did not fail to comply with its insurance policy, and that Spring Creek's appraiser, Steve Ed-

8. *Gen. Star Indem. Co. v. Spring Creek Vill. Apartments Phase V, Inc.*, 152 S.W.3d 733, 736–37 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (*"Gen. Star II"*) (reversing summary judgment in favor of Spring Creek on its attempt to enforce Taylor's award because Spring Creek's appraiser, Steve Edwards, had a financial interest in returning an estimate above $2 million, thereby raising a fact issue as to his impartiality; Taylor admitted that the award was based in part on Edwards's estimate).

9. *Id.* at 736.

10. *Id.* The ruling on this extracontractual claim was not appealed.

11. Spring Creek's claim that Reliance and General Star had breached their contracts was tried separately from Spring Creek's claim that the insurance companies had violated provisions of the Insurance Code and the DTPA.

12. *Gen. Star Indem. Co. v. Spring Creek Vill. Apartments Phase V, Inc.*, No. 01–01–01181–CV, 2002 WL 243300 (Tex.App.-Houston [1st Dist.] Feb. 21, 2002, no pet.) (per curiam, not designated for publication) (*"Gen. Star I"*) (dismissing appeal of non-final judgment).

13. *Gen. Star II*, 152 S.W.3d at 736.

14. *Id.*

15. *Id.* at 737.

16. *Id.* at 738.

wards, was not impartial.[17] As a result of this finding, which is not challenged on appeal, the appraisal award is no longer binding.[18] The jury further found that the total amount of tornado-related property damages sustained by Spring Creek had a replacement cost value of $444,492.00 and an actual cash value of $377,818.20. Because the damages found by the jury did not reach General Star's layer of coverage, the trial court signed a take-nothing judgment in General Star's favor.[19]

After the trial court denied Spring Creek's motion for new trial, Spring Creek brought this appeal challenging the factual sufficiency of the property damage evidence and the trial court's denial of its motion for new trial. Because we are required to review all the evidence to determine factual sufficiency, the key property damage testimony is summarized below.

## L.  Key Property Damage Testimony

### 1.  Alton Christian, AC Roofing & Construction

Christian testified that between February 25 and March 1, 1998, AC Roofing replaced the blue tarpaulins over the damaged roofs with temporary repairs. He stated that "this would prevent further damage caused by the tornado," and guaranteed it would prevent 90% of additional rain from entering. Christian further testified that the buildings showed signs of preexisting leaks.

### 2.  Scott Tracy, Archie Tracy's Son

Scott Tracy ("Scott") testified that Spring Creek's maintenance personnel put sheets of blue tarpaulins over the damaged roofs immediately after the tornado. According to Scott, these were not installed on every roof, but on some buildings, the tarpaulins were nailed to the mansards and through the roof. He testified that Dan McLain came to the site the day after the storm and did not object to the way the plastic was nailed to the roofs.[20]

Scott stated that Global Steel personnel nailed visquine to the roof mansards between April 10 and April 18, 1998. He also described the meeting between himself, McLain, Frazier, Frank Jones from Jansen & Co., Tracy's other son William Buzzell, and Chris Purcell of Global Steel. According to Scott, the group entered only one apartment and went onto one roof[21] before the other attendees became upset by some of Scott's remarks and left. Scott testified that McLain wrote to Spring Creek on April 22, 1998 complaining of the visquine nailed to the roofs, so the material was removed and the resultant nail holes were patched with the same type of epoxy referred to in the Southwest Service bid.

According to Scott, Chris Purcell of Global Steel introduced him to Steve Edwards of City Wide Construction, and Edwards proposed Taylor as an umpire. Finally, Scott agreed that General Star had

17. Spring Creek does not challenge this finding on appeal. The jury did not find that General Star's appraiser, John Lochridge, lacked impartiality.

18. *See Gen. Star II,* 152 S.W.3d at 737 ("If the jury finds the appraiser is [not] impartial, it follows that the appraisal award was not in compliance with the insurance policy and is not binding.").

19. The jury also found that Spring Creek had an actual loss of business income of $16,000

"due to the necessary suspension of Spring Creek's operations during the period of restoration" following the tornado. Because Spring Creek provided no briefing regarding the jury's finding of lost business income, any challenge to that finding is waived. TEX. R.APP. P. 38.1.

20. At that time, 250–260 units were rented out of a total of 314 units.

21. Frazier, however, did not go onto the roof.

no obligation to pay Spring Creek before the appraisal award, and that there was currently no binding appraisal award.

### 3. Deborah Frazier, Calvary Construction Co.

Frazier testified that she inspected apartments on six occasions between February 12 and March 4, 1998. According to Frazier, she and Greg Herring inspected every unit for which they were given a key. She testified that all work, from scope to final inspections, could have been performed in 18 weeks, and Calvary could have performed the repairs at the prices quoted in its estimate. Frazier also testified that only a minimal amount of water could possibly get in through temporary repairs, but nailing visquine to the roof through 1″ × 4″ nailers could have caused new damage.

### 4. Greg Herring, Jansen & Co.

Herring testified that he walked over all of the roofs more than once, and his estimate was his independent opinion regarding the scope of the damage. He also indicated that damage could increase in the time between an estimate and the repairs.

### 5. Anthony Colucci, Claims Adjuster for General Star

According to Colucci, both McLain and Scott Tracy told him immediately after the loss that the damage would not approach a million dollars.

### 6. Art Jansen, Jansen & Co.

Jansen testified that he "spot-checked Greg [Herring]'s work." He stated that he was comfortable with Herring's assessment. Jansen further stated, "I didn't think it was a million-dollar loss when we were involved."

### 7. Greg Presswood

Greg Presswood inspected Spring Creek and provided the "scope" used in the estimates prepared by Steve Edwards of City Wide Construction and umpire Leonard Taylor. According to Presswood, Taylor began with Edwards's estimate and removed items from it or reduced the pricing until the total amounted to $2.1 million. Presswood described Edwards's instructions to him as follows:

Q: Tell the jury what Mr. Edwards instructed you to include in your scope?

A: Mr. Edwards indicated that it wasn't my job to determine where the damage came from, that it was only my job to note that there was damage in the unit. So, whatever kind of damage I found, I was supposed to make a note of that then turn those notes into [sic] him.

Q: Did he instruct you to include any blemish in any apartment unit, no matter what the cost [sic]? [22]

A: Yes.

Q: So that if you walked into an apartment unit and found stained carpet, no matter what the cause, you were to include replacement or repair or something in your estimate on that carpet?

A: Actually, I would make the note that there was damage in that unit. Then Mr. Edwards reviewed the scope notes and then ultimately told me what to put in. But in the largest of the three estimates that I wrote, that one did include just about everything that we had in the scope notes. I can't tell you with absolute certainty that everything

---

**22.** Based on the following question, the word "cause" rather than "cost" may have been intended.

was included, but just about everything that was on my notes wound up in Mr. Edwards'[s] estimate.

Q: And that would include things that, based on your observations, were obviously not caused by the storm?

A: Some of them, yes.

. . .

Q: Did Mr. Edwards instruct you to include in the estimate damage caused from any and every source?

A: Yes.

Q: Did that include stains in ceiling and carpet and wall damage from any source?

A: Yes.

Q: Did he instruct you to prepare an estimate of damages in the apartment complex regardless of the source of the damage?

A: Yes.

Q: Did he instruct you to help him prepare an estimate that included every blemish out there?

A: Yes.

Presswood further testified that Edwards introduced him to Taylor and invited Presswood to an off-shore fishing trip with Taylor and another umpire nominee suggested by Edwards. Presswood stated, "[T]hey had asked me not to say anything about going on the fishing trip because they thought I wouldn't—might not be appropriate for Mr. Taylor and Mr. Edwards to be on the same boat." According to Presswood, Edwards and Taylor had known one another for years, and "Mr. Edwards told me I should not repeat it to anyone."

### 8. Leonard Harvey Taylor, Umpire

Taylor agreed that his estimate included damages that may have resulted from leaking roofs that were not damaged by the tornado. On the other hand, he also denied that he included interior damage that he did not believe was caused by the tornado. He agreed that the Calvary and Jansen estimates may have been accurate at the time they were written. He further testified:

Q: In fact, you have attempted in your estimate to only include weather-related damage that you observed, correct?

A: Yes, that's correct.

Q: And you don't know if it was weather-related from before the February '98 storm or during that storm or after that storm. Fair to say?

A: That's correct.

Q: So what you have got in your estimate may well be damage that was caused prior to the storm, correct?

A: Yes, sir.

. . .

Q: You haven't tried to make any calculation as to how much damage is in that estimate which leaked though a flat roof, not as a result of an opening caused by the storm?

A: No, sir.

Taylor stated that he might have met Presswood on the date Presswood identified, but testified that he had not been on a fishing trip with Edwards.

### 9. Cipriano Sanchez

Sanchez testified that he replaced the roofs on 16 buildings after the tornado, and in the year before the tornado, he patched the roofs on 20 of the 29 buildings in the complex.

### 10. John Lochridge, Jr., Unified Building Sciences, Inc.

Lochridge estimated the covered property damage at $293,120.01.

### 11. William Buzzell, Maintenance, Spring Creek

Buzzell, one of Archie Tracy's sons, testified that he supervised repairs and thought they could have been performed in a month.

### 12. Archie Tracy, Owner, Spring Creek

Tracy testified that his maintenance personnel immediately nailed blue tarpaulins to the damaged roofs with $2'' \times 4''$s. He had also applied "one-ply hot tar with felt" to the damaged roofs.[23]

Tracy testified that Chris Purcell of Global Steel told him to invoke the appraisal provision and suggested that Edwards be named as Spring Creek's appraiser. Tracy explained that he did not understand at that time that he was required to use a competent and impartial appraiser. He agreed that Global Steel covered more roofs than had previously been covered with blue tarpaulins, but stated that this was because the roofs were leaking. He further testified that the visquine was removed after McLain complained:

Q: Well, if you thought you needed to put these covers on to slow down the leaks, so to say, why did you take them off?

A: Well, just—I was just doing what I—you know, good question.

Q: Well, you got this complaint from McLain—

A: I know. That's why I took them off. Now, in 20/20 hindsight, you know, I was trying to—I was just trying to do the right things here.

Q: Well, why hadn't you already started by this time, mid-April, the permanent roof repair replacement?

A: I didn't have the money at that time.

It is undisputed that the $50,000 check for temporary repairs was dated February 27, 1998, and Tracy subsequently testified that he received it on March 11, 1998. In addition, Tracy testified regarding prior roof leaks and repairs. Tracy agreed that he replaced two roofs in 1996 and was invoiced $5,280 for one and $6,525 for the other. A third roof was replaced for $7,200.

Tracy stated that he thought he could not perform repairs until the appraisers were finished. He also explained that he hired David Booth's construction company in October 1998 to perform repairs because Booth was willing to start work without an advance payment.[24] According to Tracy, the prices for the roof replacements were higher than those Tracy had previously paid for roofing because "[w]hen you don't have the money, you usually pay more. Like if you don't have money to buy a car, you get 18 percent interest."

### 13. Donald Laurent

Laurent was hired by subsequent owners of the apartment complex in 2001 to replace 11 roofs. He testified that $600,-000–800,000 of tornado damage still remained at that time.

### II. ISSUES PRESENTED

Spring Creek first challenges the factual sufficiency of the damages evidence, contending the award is manifestly too small and against the overwhelming weight of

---

**23.** These were the temporary repairs performed by AC Roofing.

**24.** Tracy further testified that, in 1996, he refinanced Spring Creek and used the money to invest in building mini-storage units with David Booth.

the evidence. For this reason, Spring Creek asserts in its second issue that the trial court abused its discretion in denying Spring Creek's motion for new trial.

### III. PRESERVATION OF ERROR

As a threshold issue, we must first address General Star's contention that Spring Creek has waived its complaints on appeal by failing to argue that harmful error was committed, a subject discussed *infra*. Specifically, General Star contends that Spring Creek failed to argue on appeal that the jury was required to find damages in excess of $1 million.

We disagree, however, with General Star's statement that Spring Creek failed to allege harmful error. Although Spring Creek does not use the term "harmful error" or cite to the rule governing reversible error in civil cases, it states in its brief, "Because the jury's damage award was less than the amount of the $1 million primary insurance policy issued by Reliance, the trial court entered a take-nothing judgment in General Star's favor." [25] In support of its argument that the jury's award was manifestly too small, Spring Creek relies in part on repair estimates exceeding $1 million. We therefore interpret Spring Creek's arguments to include that the jury erred in its calculation of damages, and that the error was harmful because it "probably caused the rendition of an improper judgment." *See* TEX.R.APP. P. 44.1(a)(1).

### IV. ANALYSIS

#### A. Standard of Review

When considering a factual sufficiency challenge to a jury's verdict, we must review and weigh all the evidence, not just the evidence that supports the verdict. *See Mar. Overseas Corp. v. Ellis,*

971 S.W.2d 402, 406–07 (Tex.1998); *Nip v. Checkpoint Sys., Inc.,* 154 S.W.3d 767, 768–69 (Tex.App.-Houston [14th Dist.] 2004, no pet.). To successfully challenge the factual sufficiency of the evidence supporting an adverse finding on an issue on which the appellant had the burden of proof, the appellant must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001) (per curiam). We may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Id.* (citing *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986)); *Mar. Overseas Corp.,* 971 S.W.2d at 407; *Nip,* 154 S.W.3d at 769. We will not reverse unless the error about which the appellant complains probably caused the rendition of an improper judgment. TEX.R.APP. P. 44.1(a)(1). Moreover, we are not permitted to "focus only on the weakest evidence supporting the judgment and then choose to believe witnesses that the fact-finder below found unpersuasive." *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996) (per curiam); *see also Farr v. Bell,* 460 S.W.2d 431, 434–35 (Tex.Civ.App.-Dallas 1970, writ ref'd n.r.e.) ("Even though the findings of fact are not conclusive on appeal, we have no authority under the facts of this case to hold that the trial court should have believed the witnesses whose testimony it saw fit not to believe."). We may not simply substitute our judgment for that of the jury. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003).

#### B. Range of Evidence

The factfinder faced with conflicting evidence may choose which witnesses to believe and may resolve inconsis-

---

**25.** Appellant's Brief, at 2.

tencies in any witness's testimony. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986) (citing *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 543, 252 S.W.2d 561, 563 (1952) and *Benoit v. Wilson,* 150 Tex. 273, 282, 239 S.W.2d 792, 797 (1951)). In particular, the trier of fact "is afforded considerable discretion in evaluating opinion testimony on the issue of damages." *Id.* Thus, it is well-established that the jury has discretion to award damages within the range of evidence presented at trial.[26]

■ Here, the jury heard evidence of several estimates for the total amount of property damage. Lochridge estimated the damage at $293,120.01. Calvary Construction's estimate totaled $376,729.09. The Jansen estimate included total covered property damages in the amount of $444,492.30. Taylor's estimate of replacement costs totaled $2,105,790.98 with an actual cash value of $1,566,673.51, and Edwards produced an estimate of $5,286,005.56.

The jury found that Spring Creek suffered covered property damage with a replacement cost of $444,492.00 and an actual cash value of $377,818.20. These figures are within the range of the evidence: they are greater than the amount of damages estimated by Lochridge and Calvary, and are exceeded only by the estimates of Edwards and Taylor. On appeal, however, Spring Creek denies that the amount of covered property damage found by the jury is supported by the record, arguing instead that these damages are too low.

## C. Sufficiency of Supporting Testimony

Spring Creek argues that General Star offered no competent expert testimony supporting the jury's award. In support of this argument, Spring Creek relies on *Prescott v. Kroger Co.* 877 S.W.2d 373, 374–76 (Tex.App.-Houston [1st Dist.] 1994, writ denied). In that case, the First Court of Appeals held that because the jury found that the plaintiff's surgery and medical treatment for a herniated disk were the result of the incident made the subject of the suit, the verdict awarding zero damages for past pain and suffering was manifestly unjust. *Id.*

In *Prescott,* causation was established, and the evidence of pain was uncontroverted. *Id.* Here, however, the jury heard conflicting evidence regarding causation, the scope of damages, and the costs of repair or replacement, and resolved the conflict within the range of the evidence. Without repeating the previously-summarized testimony, the jury's determination of damages is supported by the testimony of Frazier, McLain, Christian, Lochridge, and Herring, each of whom calculated covered property damage at an amount approximately equal to or less than the damages found by the jury. The finding is also supported by documentary evidence such as itemized estimates and invoices for past repairs. The take-nothing judgment,

---

**26.** *See, e.g., Gulf States Utils. Co. v. Low,* 79 S.W.3d 561, 566 (Tex.2002); *Vela v. Wagner & Brown, Ltd.,* 203 S.W.3d 37, 49–50 (Tex. App.-San Antonio 2006, no pet.); *KW Constr. v. Stephens & Sons Concrete Contractors, Inc.,* 165 S.W.3d 874, 887 (Tex.App.-Texarkana 2005, pet. denied); *Price Pfister, Inc. v. Moore & Kimmey, Inc.,* 48 S.W.3d 341, 352 (Tex. App.-Houston [14th Dist.] 2001, pet. denied); *Knox v. Taylor,* 992 S.W.2d 40, 50, 62 (Tex. App.-Houston [14th Dist.] 1999, no pet.); *Duggan v. Marshall,* 7 S.W.3d 888, 893 (Tex. App.-Houston [1st Dist.] 1999, no pet.); *Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.,* 928 S.W.2d 100, 108 (Tex.App.-Houston [14th Dist.] 1996, writ denied); *City of Houston v. Harris County Outdoor Adver. Ass'n,* 879 S.W.2d 322, 334 (Tex.App.-Houston [14th Dist.] 1994, writ denied).

which is based on the jury's finding of damages in an amount less than $1 million, is further supported by the previously-summarized testimony of Colucci, Sanchez, and Jansen.

## D. Damages After March 12, 1998

Spring Creek also contends that roof repairs were delayed until late 1998 due to slow insurance payments and the need for repeated property inspections. Spring Creek further asserts that the jury awarded damages only through March 12, 1998 despite uncontroverted testimony from Christian, Frazier, Sanchez, Laurent, and Taylor regarding subsequent damage to apartment interiors. Thus, Spring Creek reasons, the damage award is manifestly too small and against the overwhelming weight of the evidence presented at trial.

We must reject this argument for several reasons. First, it is predicated on assumptions that cannot be inferred from the findings, but instead are contrary to the presumptions we are required to apply. Moreover, the evidence is not uncontroverted as Spring Creek suggests. And finally, even if we could accept all of these contentions, they are insufficient to demonstrate reversible error. As discussed below, each of these reasons is independently sufficient to overrule Spring Creek's first issue.

### 1. Inapplicable Assumptions

■ Spring Creek's argument is based on its assumptions that (a) the jury adopted the Jansen estimate prepared on or about March 12, 1998; (b) additional tornado-related damages that arose after March 12, 1998 were not included in the

Jansen estimate; and thus, (c) the jury failed to consider covered damages that arose after March 12, 1998.[27]

■ It is true that the jury's finding regarding the replacement cost of damaged property differed from the Jansen estimate by only $0.30. But however plausible Spring Creek's theory of the jury's analysis might be, the jury's reasons for reaching a particular damage award are irrelevant in the absence of jury misconduct.[28] *See First Nat'l Bank in Dallas v. Zimmerman,* 442 S.W.2d 674, 678 (Tex. 1969) (jury's reasoning process is irrelevant absent jury misconduct); *Vela,* 203 S.W.3d at 48 (the jury's mental processes in determining the amount of damages are not ordinarily cognizable by an appellate court). And Spring Creek offers no authority for this court "to go behind the jury's consideration, determination, and weighing of the evidence" in evaluating the damage award. *See Mo. Pac. R.R. Co. v. Roberson,* 25 S.W.3d 251, 259 (Tex.App.-Beaumont 2000, no pet.) (evaluating allegedly excessive damage award and refusing to consider jury's reasoning in arriving at its finding).

■ To the contrary, in reviewing a damage award for factual sufficiency, we generally begin with the jury charge and instructions. *Golden Eagle Archery,* 116 S.W.3d at 762. Here, the jury was asked to determine the total amount of Spring Creek's covered property damages "that were caused by or that resulted from the February 10, 1998 tornado." The jury was instructed to include damage caused by water that entered structures through "*any* damage or opening caused by" the

---

**27.** The Jansen estimate is undated. Scott Tracy testified that he fired Greg Herring, the Jansen appraiser, in mid-March, and Herring testified that he no longer worked for Jansen after March or April of 1998.

**28.** No jury misconduct is alleged in this case.

tornado.[29] This instruction contained no time limitation. Because we presume the jury followed the trial court's instructions,[30] we cannot infer that the jury restricted its consideration to those damages that arose by March 12, 1998. Instead, we presume that the jury considered all interior damage caused by tornado damage.

### 2. Controverted Testimony

We must also reject Spring Creek's contention that the testimony of various witnesses is uncontroverted on the subject of tornado-related damages that arose after March 12, 1998.

#### a. Alton Christian's Testimony

Spring Creek relies on Christian's agreement with the statement that "it doesn't make a whole lot of sense to try to estimate the scope of interior damages until the roofs have been replaced...." But Christian also testified that he patched the roofs to "prevent further damage" and completed that work on March 1, 1998. All of the estimates of interior damage are dated after he concluded those repairs.

#### b. Deborah Frazier's Testimony

Spring Creek also relies on Frazier's testimony, such as the following:

Q: You have already told us you would expect to have damages enhanced by reason of roof replacement after rain and the same thing would be true with respect to the time period after March 4, your last scoping, until you were there in April, i.e., you would expect the damage to be enhanced by reason of the rains that fell in the interim, isn't that true?

A: A certain amount of rain could have gotten into those units, yes, sir.

But Frazier also testified that any additional damage would be "[v]ery minimal" and she "wouldn't think that rain would come in if roofs were tarped." As previously indicated, Spring Creek covered damaged roofs with tarpaulins immediately after the tornado, and AC Roofing performed temporary repairs by the end of that month.

Moreover, Frazier agreed that rain damage arising after March 4, 1998 could have been caused from Global Steel's actions in driving nails through the roofs to attach plastic coverings. Finally, the jury's damage finding exceeds the estimate Frazier prepared; thus, the jury could have considered rain damage in arriving at the total amount of covered damage.

#### c. Cipriano Sanchez's Testimony

Sanchez's cited testimony is similarly unhelpful. Spring Creek emphasizes that Sanchez was unaware of any leaking roofs at the time of the tornado. But Sanchez was aware of preexisting leaks and the general tendency of the flat roofs at Spring Creek to leak:

Q: At the time of the tornado, as far as you know, were there any roofs out there leaking at Spring Creek Village Apartments?

A: At the time of the tornado—not that I knew *because the ones that were leaking, I would fix them right away* so—

Q: Okay.

A: —at that moment, probably not.

(emphasis added). Sanchez further testified that in the year before the tornado, he repaired leaks in 20 buildings of the apartment complex.[31] Sanchez did not attribute these leaks to storm damage, but instead

---

**29.** Emphasis added.

**30.** *Vela,* 203 S.W.3d at 48.

**31.** At various places in the record, the total number of buildings is stated as 29, 30, or 33.

explained that they were related to metal flashing:

> A: [O]n the roofs, especially on flat roofs, the metal expands and contracts depending on the heat, if it is cold or hot, so most of the leaks on a flat roof are on the perimeter of the roof, on the edge, and that's why when two flashings meet together, something, one was raised, probably, 1 inch.

#### d. David Laurent's Testimony

David Laurent testified that in 2001, he replaced 11 roofs for the subsequent owners of the apartment complex. According to Laurent, he determined there was latent, tornado-related damage to the roofs that was not detected by any of the prior appraisers. This testimony conflicts with evidence provided by several other appraisers.[32]

#### e. Leonard Taylor's Testimony

Spring Creek additionally relies on Taylor's testimony. As previously noted, Taylor relied in part on the work of Edwards. Taylor further agreed that the Calvary and Jansen estimates may have been correct at the time they were written. Moreover, he admitted he included weather-related damages regardless of whether the damages were the result of the tornado. Taylor's testimony is not inconsistent with an inference that some of the observed damage was caused by preexisting leaks, by leaks due to the expansion and contraction of metal flashing as described by Sanchez, or by holes caused when Global Steel drove nails through the roofs.

#### 3. No Harmful Error

For each of the foregoing reasons, we conclude the evidence is factually sufficient to support the jury's finding. But even if

we concluded that error had occurred, only harmful errors are reversible. See Tex. R.App. P. 44.1(a). And even if the jury failed to consider an additional half million dollars of damages, the total damages would still be less than $1 million; thus, General Star's excess coverage would not be reached. See G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co., 177 S.W.3d 537, 546 (Tex.App.-Dallas 2005, no pet.) (concluding that appellant waived complaint regarding trial court's failure to submit an instruction on good faith where the party's appellate briefing included "no argument of why the instruction was necessary to support its cause of action for breach of the agreement, nor any argument of how the instruction's absence harmed" the appellant); Hernandez v. Am. Appliance Mfg. Corp., 827 S.W.2d 383, 385 (Tex.App.-Corpus Christi 1992, writ denied) (where the deceased's beneficiaries needed findings of damages exceeding $3 million to recover anything, "there was a 'cushion' of $1,345,000 which the jury could have found in pain and suffering, and still a take-nothing judgment would have been proper"). Spring Creek did not establish that the jury failed to consider damages in an amount that would have reached General Star's layer of coverage. For this additional reason, we overrule Spring Creek's first issue.

### E. Motion for New Trial

■ When the party with the burden of proof moves for a new trial on the ground that the evidence is factually insufficient to support the verdict, we review the trial court's denial of the motion for abuse of discretion. Champion Int'l Corp. v. Twelfth Court of Appeals, 762 S.W.2d 898, 899 (Tex.1988) (per curiam). Because

---

**32.** Moreover, Laurent agreed his opinion was based in part on the assumption that there were only two prior storms that could have caused the damage, and that all damage from the May 1999 windstorm had been repaired, leaving only the 1998 tornado damage.

the evidence is factually sufficient to support the verdict, the trial court did not abuse its discretion by denying Spring Creek's motion for new trial. We therefore overrule Spring Creek's second issue.

## V. Conclusion

We conclude that the jury's finding regarding the amount of covered property damage is not against the great weight and preponderance of the evidence. Thus, the trial court properly signed a take-nothing judgment and denied Spring Creek's motion for new trial. We therefore affirm the trial court's judgment.